[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10509

_____

D.C. Docket No. 1:16-cr-20272-JAL-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAMON COBENA DUENAS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 11, 2018)

Before ED CARNES, Chief Judge, MARCUS, and EBEL,* Circuit Judges.

MARCUS, Circuit Judge:

_____

* Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

After trial by jury, Ramon Cobena Duenas was convicted of conspiring to exchange counterfeit currency, and dealing in counterfeit currency, in violation of 18 U.S.C. §§ 371 and 473.  On appeal, Cobena Duenas challenges his convictions, claiming that the government failed to prove he knew the transaction involved counterfeit United States currency.  After review, we affirm.

I.

The essential facts adduced at trial are these.  On April 4, 2016, Customs and Border Protection agents at Miami International Airport found counterfeit currency in a bag carried by Jose Uceda, a traveler who had arrived from Peru.  Uceda was carrying $632,300 in counterfeit $100 bills, with a fair market value of at least $125,000.  The counterfeit currency was sewn or glued inside of zippered bags found in Uceda's luggage.  Secret Service agents determined that Uceda was unaware of the bags' contents, and Uceda agreed to help the Secret Service catch the individuals who planned to pick up the counterfeit money.  Uceda agreed to pose as the courier responsible for bringing the bills into the United States in exchange for a fee, and he agreed to make contact with "Patty," from whom he got the suitcase in Peru.  Uceda told Patty he had arrived in Miami and asked her who would pick up the suitcase.

After speaking to Patty, Uceda received a call from a man identified as "Cesar," who used a New York number.  Cesar turned out to be Milton Cabeza

2

Juarez, Cobena Duenas's co-conspirator.  Uceda told Cabeza that he discovered counterfeit currency in the suitcase and that he brought the money to Miami, but that he wanted to be compensated for the risks attendant to transporting the currency to the United States.  Cabeza agreed to pay Uceda $5,000 for his labors, and asked whether Uceda would transport more counterfeit currency in the future. Uceda and Cabeza agreed that the payment of Uceda's fee and the delivery of the counterfeit currency would take place on April 11, 2016 in Miami.

Cellular phones found in the co-conspirators' possession established that, between April 9 and April 11, 2016, Cobena Duenas and Cabeza called each other 61 times, including 39 calls on April 11 alone.  None of the calls lasted more than two minutes, and the substance of the conversations is unknown.  Additionally, on April 9, Cobena Duenas sent a text message to a woman named Mia De Los Santos, which read, "My love, wait for me until Monday because I'm going to do a special work now and I don't have money now."  And on April 11, the date of the transaction, De Los Santos texted Cobena Duenas, "Good luck, God protect you and guide you."  The government's investigation further revealed that Cabeza bought airline tickets from New York to Miami for himself and Cobena Duenas, and that he rented a car for their travel while in Miami.

The April 11 meeting was arranged to take place at a Miami restaurant, the Latin Bohemia Grill, where undercover police officer Detective Edwin Pagan

3

would accompany Uceda to meet Cabeza. Cabeza and Cobena Duenas traveled together on the same flight from JFK airport in New York to Miami on April 11, 2016. Later that day, Cobena Duenas entered the designated restaurant and stood near the bar, in a small hallway area. Cabeza walked in shortly thereafter and approached Uceda and Detective Pagan as they sat at a table. Cabeza told Uceda and Detective Pagan he was prepared to complete the transaction, but he wanted the exchange to take place in the parking lot, not inside the restaurant. Pagan and Uceda agreed. After the three men negotiated where the transaction would take place, Detective Pagan asked Cabeza if he brought the money for the transaction. Cabeza took Uceda to meet Cobena Duenas, who lifted up his shirt and showed Uceda a large bundle of cash. Cobena Duenas and Cabeza then walked out of the restaurant, and Detective Pagan received authorization to conduct the transaction in the restaurant parking lot.

Detective Pagan left the restaurant, returned with the counterfeit currency in a truck, and reentered the building. Notably, Cobena Duenas returned alone to the restaurant to meet with Uceda and Detective Pagan. Surveillance footage also showed Cobena Duenas walking to the restaurant alone. During the meeting, the three men walked out of the restaurant, went into the parking lot, and toward Detective Pagan's van. Detective Pagan asked Cobena Duenas if he had the money; Cobena Duenas said "yes," removed the cash from his waistband, and told

Detective Pagan "to count it, it's all there." Cobena Duenas confirmed to Uceda and Detective Pagan that he had carried $5,000 in cash. While Detective Pagan was counting the money, Cobena Duenas urged him to "do it faster."

After Cobena Duenas handed the money to Detective Pagan but before he was shown the counterfeit bills, Detective Pagan gave a verbal and visual signal and law enforcement authorities arrested Cobena Duenas. Cabeza was seated in a rental car across the street from the restaurant, in "the general area where [Cobena Duenas] came from," when the authorities arrested him as well.

Cabeza and Cobena Duenas were charged in a two-count indictment by a federal grand jury sitting in the Southern District of Florida shortly thereafter. Cabeza pled guilty to the conspiracy charge, and Cobena Duenas proceeded to trial. Following trial, and after deliberating for approximately one hour, the jury sent this question to the court: "For Count Number 1, is [the knowledge element] specific to the counterfeit currency or just the person knowing he is doing something unlawful in general?" After conferring with both parties, the district court responded this way:

> It is specific to the counterfeit currency. You will recall that in the general conspiracy charge there were certain elements that had to be proved. There are four elements. One of the elements is that "the defendant knew the unlawful purpose of the plan and willfully joined in it." The purpose of the plan was counterfeit currency.

5

So please consider this instruction in conjunction with all of the other instructions.  Do not dwell on one particular instruction.  Consider all of the instructions as a whole.

The jury found Cobena Duenas guilty as charged on both counts.  This timely appeal followed.

## II.

The only issue raised by appellant is whether the evidence was sufficient to establish beyond a reasonable doubt that Cobena Duenas knew the unlawful object of this conspiracy and intended to deal in counterfeit money.

We review the sufficiency of the evidence de novo, taking the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict.  United States v. Feliciano, 761 F.3d 1202, 1206 (11th Cir. 2014).  The question then is whether, when viewing the evidence in that light, a reasonable juror could find the essential element of knowledge beyond a reasonable doubt.  United States v. Spoerke, 568 F.3d 1236, 1244 (11th Cir. 2009).  "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt."  United States v. Martinez, 763 F.2d 1297, 1302 (11th Cir. 1985) (quotation omitted).

To convict Cobena Duenas of criminal conspiracy under 18 U.S.C. § 371, the government had to prove that: (1)  an agreement existed between two or more

6

persons to commit a crime; (2) Cobena Duenas knowingly and voluntarily joined or participated in the unlawful agreement; and (3) a conspirator performed an overt act in furtherance of the unlawful agreement. United States v. Dominguez, 661 F.3d 1051, 1064 (11th Cir. 2011). The unlawful agreement may be established by direct or circumstantial proof, including reasonable inferences drawn from the statements or conduct of the participants. United States v. Cross, 928 F.2d 1030, 1042 (11th Cir. 1991). Moreover, the government must prove that the conspirators had specific knowledge of the conspiracy's unlawful object. See United States v. Sarro, 742 F.2d 1286, 1297 (11th Cir. 1984). A person violates 18 U.S.C. § 473 when he "buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine . . . ." 18 U.S.C. § 473. While the statute has no express mens rea requirement, by now "it is well established that the required mental state for this crime is knowledge -- a defendant must know that the instrument at issue was counterfeit." United States v. Brown, 752 F.3d 1344, 1346 (11th Cir. 2014) (emphasis added).

We have recognized that guilty knowledge can rarely be established directly, and have therefore held that a jury may infer knowledge and criminal intent from circumstantial evidence alone. United States v. Clay, 832 F.3d 1259, 1309 (11th Cir. 2016). Thus, the government can establish knowledge "through proof of

7

surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." United States v. Gonzalez, 834 F.3d 1206, 1215 (11th Cir. 2016) (quotation omitted).  A conviction may be supported by reasonable inferences, not by mere speculation.  United States v. Knowles, 66 F.3d 1146, 1155 (11th Cir. 1995).  Neither association with a co-conspirator nor presence at the scene of a crime, standing alone, will support a finding of specific knowledge.  United States v. Louis, 861 F.3d 1330, 1333 (11th Cir. 2017).

We have repeatedly held, however, that because "a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders," when the orchestrator of a conspiracy vests substantial trust in an associate to contribute to the scheme, a jury may infer the associate's knowing participation.  United States v. Cruz-Valdez, 773 F.2d 1541, 1547 (11th Cir. 1985) (en banc).  The rationale behind the "prudent smuggler doctrine," as it has become known, is straightforward.  A prudent smuggler seeks to facilitate the exchange of contraband in order to enrich himself while evading apprehension by law enforcement officers.  He is, therefore, not inclined to navigate the contraband markets' perils and uncertainties alone.  See id. at 1546–47 (discussing the prudent smuggler's reliance on "strong arm men" and other "precaution[s]" to mitigate "the ever-present risks of robbery or 'rip-offs'").  Rather, he is disposed to trust a confidant to provide loyal and competent assistance in securing the illicit transaction's smooth performance.  Id.  Loyalty is

8

necessary to ensure that the confidant will not abscond with the valuable contraband; and competency is necessary to ensure that the confidant will effectively consummate the plan. In entrusting the confidant, then, the smuggler will likely apprise him of the transaction's essential details, including the nature of the contraband involved, so that the confidant may overcome the "normal but deadly hazards implicit in [contraband] trafficking." Id. at 1546–47; see also United States v. Quilca-Carpio, 118 F.3d 719, 721–22 (11th Cir. 1997) ("A reasonable jury could infer from the quantity of drugs seized that a 'prudent smuggler' is not likely to entrust such valuable cargo to an innocent person without that person's knowledge.") (citation omitted).

In our binding precedent, we have applied the prudent smuggler doctrine in cases involving drug crimes. And Cobena Duenas relies on our precedents involving drug crimes to support his arguments in this case. As a result, we see no reason not to apply the doctrine, where appropriate, to the distribution of counterfeit United States currency.

Viewed in the light most favorable to the government and the jury's verdict, the evidence sufficiently established that Cobena Duenas knew the unlawful object of the conspiracy and intended to deal in counterfeit currency. For starters, Cobena Duenas had ample opportunity to discover that he was dealing in counterfeit money. Leading up to the April 11 exchange, he shared substantial contacts with

9

Cabeza, who undisputedly knew all of the transaction's details and set up the planned exchange. As we have noted, between April 9, 2016 and April 11, 2016, the date of the transaction, the pair called each other 61 times. On April 11 itself, Cabeza and Cobena Duenas spoke 39 times, beginning at 3:51 a.m. Although each phone conversation was brief, there were enough total calls to facilitate Cobena Duenas and Cabeza's exhaustive collaboration. Moreover, and perhaps more significantly, the two men flew together from New York to Miami on Cabeza's dime, and shared a car while they were in Miami. Based on the frequency with which they conferred and their time spent traveling together, a jury could reasonably have inferred that Cobena Duenas learned that the exchange involved counterfeit currency.

Moreover, Cobena Duenas plainly demonstrated awareness of the transaction's unlawful nature. Two days before the transaction, he texted De Los Santos, apparently his girlfriend, that he was "going to do a special work," which he suggested would be lucrative for him. De Los Santos responded, "Good luck. God protect you and guide you," thereby implying his knowing assumption of a palpable risk. Cobena Duenas also assisted in preparing for the exchange. He participated in the initial interaction at the restaurant and ensured the continued participation of Uceda and Detective Pagan by displaying the $5,000 courier fee

10

(secreted on his person) to Uceda. And, after paying Uceda's courier fee, he urged Detective Pagan to count the $5,000 "faster."

Most importantly, Cobena Duenas was instrumental to the transaction's success. Cobena Duenas bore sole responsibility for actually swapping the $5,000 for $632,300 in counterfeit $100 bills, and then returning the counterfeit bills to Cabeza in a parked vehicle across the street. Notably, he met Detective Pagan and Uceda alone to execute the deal. He alone held Uceda's $5,000 courier fee, and exercised exclusive dominion over a key part of the transaction. In short, Cobena Duenas's crucial and exclusive contributions to the transaction supported the inference that he knew he was dealing in counterfeit currency.

Finally, under the prudent smuggler doctrine, the jury in this case could reasonably infer that Cabeza would not entrust Cobena Duenas to close a deal for $632,300 in counterfeit currency without telling Cobena Duenas not only that he was buying counterfeit currency but also how much he was to receive in exchange for $5,000 in non-counterfeit currency. Without Cobena Duenas knowing that he was buying that much counterfeit currency, the sellers could have ripped off Cabeza and deprived him of the full benefit of his bargain. See Cruz-Valdez, 773 F.2d at 1546 ("A jury may find knowledgeable, voluntary participation from presence when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present."); see also United States v.

11

Figueroa, 720 F.2d 1239, 1246 (11th Cir. 1983) ("A conspiracy conviction will be upheld . . . when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him.") (citation omitted).  In other words, a reasonable jury could infer that Cabeza would never have entrusted Cobena Duenas to close the deal without telling him exactly what he was to receive and bring back.  Because Cabeza trusted that Cobena Duenas knew enough to ensure that the exchange was properly made, it is reasonable to conclude that Cobena Duenas knew exactly what he was buying and how much of it.  See United States v. Gallo, 927 F.2d 815, 821 (5th Cir. 1991) ("Drug traffickers are unlikely to entrust a large portion of the proceeds from their illicit trade to an outsider, especially when the outsider is aware of the vulnerable nature of the merchandise that he is transporting.").

To support his argument that the evidence was insufficient to establish knowledge, Cobena Duenas cites several of our decisions.  But all of them are readily distinguishable.  First, he relies on United States v. Martinez, 83 F.3d 371 (11th Cir. 1996).  There, the defendant Gallo, along with undercover narcotics detective Fernandez and confidential informant Escobedo, orchestrated a conspiracy to steal cocaine.  Id. at 373.  Gallo arrived at the house where the cocaine was stored with defendant Gomez.  Id.  Both men were armed with handguns.  Id.  They used a crowbar to break into the house, seized the cocaine,

12

and began to leave when they were immediately arrested.  Id.  Following conviction, Gomez claimed that the evidence against him was insufficient, urging that he did not know he had attempted to steal cocaine, and that Gallo told him they were going to steal money.  Id. at 374.  The Court agreed with Gomez and reversed his conviction.  Id.

Martinez is a different case.  The evidence against Gomez consisted of: Gallo's statement to the undercover detective that he had "men and guns ready" to perform the burglary; Gomez's arrival at the crime scene with Gallo; and Gomez's assistance in breaking into the house.  Id.  Gomez's knowledge of the burglary's object was unclear.  He rode with Gallo to the crime scene, armed with a handgun, and aided in the break-in.  Id. at 373.  There was nothing in the fact pattern that would have allowed a reasonable juror to infer the requisite knowledge beyond a reasonable doubt.  In sharp contrast, here, Cobena Duenas was delegated the sole responsibility to exchange $5,000 in cash for $632,300 in counterfeit bills, and to return the contraband to Cabeza's car.  Unlike the role played by Gomez in Martinez, Cobena Duenas's substantial, independent, and indeed critical participation in effecting the exchange supported the inference that he knew the object of the conspiracy.

Moreover, in Martinez, there was no evidence that Gallo and Gomez discussed the burglary at length.  There was scarce reason to believe that Gallo had

13

communicated the burglary's details to Gomez, nor did he have to in order to accomplish the strong-arm object of the conspiracy. Here, however, Cabeza and Cobena Duenas called each other 61 times in the three days leading up to the exchange (including 39 times on the day of the transaction), flew together from New York to Miami, and shared a rental car within Miami. Cobena Duenas had ample opportunity to discover the conspiracy's object.

Cobena Duenas also points to United States v. Hernandez, 896 F.2d 513 (11th Cir. 1990). There, defendant Giral argued that his convictions for conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute were based on insufficient evidence. Id. at 516. The evidence against Giral indicated that he rode in a car that delivered cocaine; he then stood near the trunk while another man handed the package of cocaine to its intended recipient. Id. at 517, 519. There was no evidence that Giral knew anything about the package until a co-defendant opened the trunk to deliver it to an undercover officer. Thus, a panel of this Court reversed Giral's convictions, holding that they were based on insufficient evidence. Id. at 520.

Hernandez cannot help Cobena Duenas. Giral's role in the drug conspiracy was of a very different character. The evidence established only Giral's association or presence at the transaction. Id. at 519. Again, in this case, Cobena Duenas's contribution to this conspiracy demonstrably exceeded association or

14

presence.  He alone held the down payment on his person, he alone delivered it to Uceda and Detective Pagan, and he alone sought to take possession of the counterfeit money and convey it to Cabeza.

Cobena Duenas's reliance on United States v. Charles, 313 F.3d 1278 (11th Cir. 2002), is likewise misplaced.  Charles involved a conspiracy to steal cocaine from an abandoned house.  Id. at 1280.  One of the defendants, Elliassaint, claimed that the evidence failed to support his convictions for conspiracy to possess with intent to distribute cocaine and conspiracy to carry a firearm in furtherance of that crime.  Id. at 1284.  The evidence established only that Elliassaint was present on one occasion with the other conspirators in a hotel room as they planned the burglary, and that he drove the conspirators to the crime scene.  Id.  There, too, Elliassaint contributed only marginally to the conspiracy.  He was not vested with substantial trust by its orchestrators, nor did he interact with them at length.

Moreover, United States v. Sarro, 742 F.2d 1286 (11th Cir. 1984), is unavailing.  Again, in that case, the defendant Tiedeberg's role was of a wholly different order than Cobena Duenas's.  He only guarded stolen paintings, but lacked any apparent knowledge of a scheme to exchange the paintings for cash.  Id. at 1298.  Indeed, the Court emphasized Tiedeberg's insubstantial communications with the other conspirators in concluding that his conviction was unsupported by sufficient evidence.  Id. at 1298–99.

15

Finally, our recent decision in United States v. Louis, 861 F.3d 1330 (11th Cir. 2017), does not help Cobena Duenas.  In Louis, a shipowner directed that two boxes containing cocaine be placed into a car at a shipyard; the defendant was sitting in the driver's seat as the boxes were loaded.  Id. at 1332.  The defendant then began driving slowly out of the shipyard as the shipowner walked alongside the car.  Id.  The police stopped the car and the defendant got out and ran, but the police arrested him.  Id.  We held that there was not enough evidence to prove that the defendant knew the boxes contained drugs based on his presence at the scene and his flight from the police.  Id. at 1334.  But in this case the 61 telephone conversations, the text message about "special work," and Cobena Duenas's responsibility for closing the deal and ensuring that the benefit of the bargain was received show that, unlike the Louis defendant, Cobena Duenas was responsible for more than merely transporting the currency.

The long and the short of it is that there was enough evidence in this case to allow a reasonable juror to find the critical element of knowledge beyond a reasonable doubt.  Cobena Duenas was no mere bystander or peripheral player in this crime.  The district court did not err in denying the motion for judgment of acquittal and, therefore, we affirm.

**AFFIRMED.**

16