[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12988

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DERRICK ALFONDSO MORLEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20519-DPG-2

_____

Before WILSON, LUCK, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

A jury convicted Derrick Morley of conspiracy to possess with intent to distribute five hundred grams or more of cocaine, in violation of 21 U.S.C. § 846, and possession with intent to distribute five hundred grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1). For each count, Morley was sentenced to a term of 60 months' imprisonment, to be served concurrently. Morley now appeals his convictions and sentence, arguing that: (1) the district court erred in denying his motion to suppress evidence that was the fruit of an unlawful search; (2) the trial evidence was insufficient to support his convictions; (3) the district court erred in providing a deliberate ignorance jury instruction; and (4) the district court erred in denying him a safety valve sentence reduction under 18 U.S.C. § 3553(f). After carefully considering the parties' arguments and with the benefit of oral argument, we affirm Morley's convictions and sentence.

## I.    FACTUAL & PROCEDURAL BACKGROUND

We begin with the government's trial evidence as to two separate cocaine deals that led to Morley's arrest. The first deal took place on August 6, 2021, when Morley's associate and codefendant, Valentino Edgecombe, sold half a kilogram of cocaine to a paid FBI confidential informant ("Fred"). The FBI learned, in early August 2021, that Edgecombe, a Bahamian national, had been in South Florida "looking to try to get off some dope." Based on this information, Fred, at the FBI's direction, arranged to meet

Edgecombe in the parking lot of a Miami shopping mall, outside of a Bass Pro Shops. With law enforcement officers surveilling, Fred bought half a kilogram of cocaine from Edgecombe for $14,000.

Following the first cocaine deal, Fred tried to negotiate a bigger deal for six kilograms of cocaine. On September 22, 2021, on a recorded phone call, Fred told Edgecombe that he had the money ready to buy more cocaine. About ten minutes later, on a second recorded phone call, Edgecombe offered to send Fred "straight to the person" with the cocaine. Edgecombe explained, however, that the person would only relinquish the cocaine if Edgecombe first cleared his debt, which he'd previously said he owed to "the guy who was holding the dope."

About an hour after the second recorded phone call, law enforcement observed Edgecombe meet up with Morley in the parking lot of a Fort Lauderdale hotel where Edgecombe was staying. Morley arrived in a maroon BMW, which law enforcement later confirmed that he owned. Morley parked near Edgecombe, entered Edgecombe's car, and they drove off together. Expecting a deal to occur, law enforcement tracked Edgecombe and Morley from the hotel, first to a car parts store and then to a Sam's Club. However, no deal took place that day.

Instead, the second deal happened six days later on September 28, 2021. The day prior, in a recorded phone call, Edgecombe again told Fred that he had to take him straight to his cocaine source to clear his debt and make the deal. Fred agreed to pay $28,000 per kilogram of cocaine, and the two decided they would

meet up the next day and go together to the cocaine source. On the morning of the deal, Edgecombe sent a WhatsApp message to Fred indicating that he could sell him three kilograms of cocaine.

Later that evening, before meeting Edgecombe, Fred met with law enforcement to prepare for a "controlled evidence purchase arrest operation." Law enforcement gave Fred a hat equipped with a covert videorecording device and a backpack containing money for the deal. Law enforcement also told Fred to persuade Edgecombe to meet him in "a specific part" of a parking lot of a Home Depot rather than going with Edgecombe to his source.

Fred arrived at the Home Depot and, to coax Edgecombe into meeting him there, told Edgecombe that his car battery "was dead" and that his key "won't crank." Edgecombe ultimately agreed over the phone to meet Fred at the Home Depot to complete the deal. So, Fred sent a text message to Edgecombe with the address of the Home Depot.

Edgecombe arrived at the Home Depot at around 8:30 p.m. and parked his car next to Fred's car. Fred asked whether Edgecombe had the cocaine with him, and Edgecombe responded, "Yeah someone is right there" and promised "[i]t's coming." Edgecombe then tried to persuade Fred to get in the car with him, but Fred refused, stating "I can't get in the car with you. I got too much money. I don't got no gun." Fred told Edgecombe to "tell [his] peoples" he can only get in Edgecombe's car if he sees the cocaine first.

Minutes later, Morley arrived in his maroon BMW and "trolled through the parking lot." He parked his car, got out, and quickly walked toward a nearby Wendy's restaurant. Edgecombe instructed Fred to "[g]o get it" from Morley's passenger seat. Fred retrieved a "small briefcase" from Morley's car and brought it to his car, confirming that it contained three kilograms of cocaine.

In the meantime, Morley tried to enter the Wendy's, but the door was locked, so he paced back and forth outside. All the while, Morley kept looking back toward the Home Depot parking lot: "[H]e just kept looking over his shoulder and then he walked into . . . [t]he driveway area of Wendy's, and he just kind of lingered in the area kind of like looking at the BMW, just watching it." After several minutes, Morley walked across the street to help a family with a broken-down car.

After Fred gave Edgecombe $84,000 for the cocaine, law enforcement arrested Edgecombe. Law enforcement then arrested Morley across the street.

Incident to his arrest, agents seized Morley's cellphone, got a search warrant, and accessed his phone. The search revealed extensive communications between Morley and Edgecombe leading up to the second cocaine deal, as well as evidence that Morley had acted on that communication. For instance, Morley and Edgecombe called each other fifteen times on the night of September 28. Edgecombe also sent the address of the Home Depot to Morley in a text message, which came two minutes after Fred had sent the same address to Edgecombe. Data from Morley's phone

showed that he looked up directions from his home in Fort Lauderdale to the Home Depot two minutes after Edgecombe had sent him the address.

Edgecombe and Morley had also communicated in the lead-up to the first cocaine deal. On August 3, 2021, Edgecombe texted Morley, "i want you ride with me to deal with something also make yourself available" and "whenever i call you i want ride with me." Then, on the day of the first deal, Edgecombe sent Morley a message with the address of the same Bass Pro Shops where Fred met Edgecombe.

A grand jury returned a three-count indictment charging Morley with conspiring to possess with intent to distribute five hundred grams or more of cocaine in violation of 21 U.S.C. § 846 (Count 1) and possessing with intent to distribute five hundred grams or more of cocaine in violation of 21 U.S.C. § 841(a)(1) (Count 3).

Morley moved to suppress the cocaine that Fred, at Edgecombe's direction, took from Morley's vehicle without a warrant. The government opposed Morley's suppression motion. The government argued that the automobile exception to the Fourth Amendment's warrant requirement applied because there was a fair probability that Fred would find contraband in Morley's car. The government noted that Fred and Edgecombe "had negotiated an $84,000 drug deal, and Edgecombe—who had previously sold [Fred] half a kilogram of cocaine—told [Fred] where to find the drugs." Thus, the government concluded, Fred reasonably

believed he would find drugs in Morley's car. In any event, the government added, the consent exception applied because Fred reasonably believed Edgecombe had the authority to direct him to search Morley's car. Morley argued that neither of the two relevant exceptions to the Fourth Amendment's warrant requirement applied to Fred's search of his car.

The district court held an evidentiary hearing at which Miami-Dade Detective and FBI Organized Crime Task Force Officer Wendell Johnson testified. After hearing the officer's testimony, the district court denied Morley's motion. First, the district court found that there was probable cause to believe Morley's car contained contraband or evidence of a crime because Edgecombe and Fred "picked specific remote locations" for their drug deals, and "it's really hard to believe that . . . [Morley] pulled up in close proximity" by happenstance. And second, the district court found that apparent authority existed under the circumstances because "the drugs were retrieved exactly where Mr. Edgecombe said that they would be."

Morley proceeded to a four-day jury trial. The government's proposed jury instructions included the pattern instruction on deliberate ignorance. At the charge conference, Morley objected to the government's proposed deliberate ignorance instruction. He contended that the record did not support the instruction because "[t]here ha[d] been no proof of any evidence in reference to fingerprints or . . . DNA" and "the testimony on exactly where the bag was located and how it was taken out of the car is extremely

wishy-washy." In response, the government argued that deliberate ignorance was "an alternative proof," which was "consistent with the evidence that Edgecombe had him drive a bag to the Home Depot, and he never made any attempt to ask Edgecombe what was in that bag, despite the multiple calls they had." The district court deferred ruling on Morley's objection.

After the close of the evidence, the district court decided to give the jury instruction because the evidence "equally could be consistent with actual knowledge or deliberate ignorance." The district court pointed to Morley's actions, like walking away from the car, and the way the drugs were packaged. The instruction mirrored the government's proposed instruction.

During trial, Morley twice moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). The district court denied both of his motions. The jury ultimately found him guilty as charged in the indictment. Afterward, Morley moved for a judgment of acquittal notwithstanding the verdict under Rule 29(c). The district court denied his motion in a paperless order.

Before sentencing, the United States Probation Office prepared a Presentence Investigation Report ("PSI") using the 2021 Sentencing Guidelines Manual. The PSI held Morley accountable for 3.518 kilograms of cocaine (about half a kilogram for the August 6 deal and three kilograms for the September 28 deal), resulting in a total offense level of 28. It also assessed three criminal history points based on Morley's prior 37-month sentence for conspiracy to import 100 kilograms or more of marijuana. With three criminal

history points, Morley fell into criminal history category II. Together, Morley's total offense level and criminal history category produced a guideline range of 87 to 108 months' imprisonment.

Through his trial attorney, Morley filed several objections to the PSI's description of his offense conduct. Despite the jury's verdict, Morley maintained his innocence and "denied all knowledge" of Edgecombe's sale of cocaine to Fred. In support, Morley attached a post-trial polygraph examination report, which claimed Morley "was truthful" in denying his knowledge of the conspiracy and the cocaine. Morley attached the full version of the polygraph examiner's report to a motion for a downward variance filed a couple of weeks later.

A new attorney later entered his appearance to represent Morley for sentencing. Through his sentencing attorney, Morley filed additional objections to the PSI in which, among other things, he argued for a base offense level of 26, because the evidence only supported his responsibility for the September 28 deal, and a role reduction under U.S.S.G. § 3B1.2. Morley also moved to continue his sentencing hearing because his sentencing attorney, unlike his trial attorney, believed that he might qualify for relief from the mandatory minimum sentence under 18 U.S.C. § 3553(f). Known as the safety valve, that statute allows the district court to impose a sentence below the mandatory minimum sentence for drug crimes if the defendant meets five criteria. § 3553(f)(1)–(5). Two of the statutory criteria are relevant here. First, under § 3553(f)(1), the district court must find that:

(1) the defendant does not have—

(A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;

(B) a prior 3-point offense, as determined under the sentencing guidelines; and

(C) a prior 2-point offense, as determined under the sentencing guidelines[.]

Second, under § 3553(f)(5), the district court must find that the defendant truthfully provided to the government "all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan."

As for § 3553(f)(1), Morley argued that his prior three-point offense for conspiracy to import marijuana did not preclude him from relief because the safety valve's criminal- history-point provision is "conjunctive." The safety valve, he argued, only excludes defendants who have all three things: (A) more than four criminal history points, excluding any points from one-point offenses, (B) a prior three-point offense, *and* (C) a prior two-point violent offense. And because he did not have more than four criminal history points or a prior two-point violent offense, he could qualify for relief if the court gave him time to submit a truthful statement to the government.

After the district court continued Morley's sentencing hearing, he submitted a written safety valve statement in an attempt to comply with § 3553(f)(5).  In his statement, Morley again claimed he did not know he had delivered cocaine to a drug deal.   He explained that, when he arrived at the Home Depot, he "walked to a nearby Wendy's for something to eat" and left his car unlocked "because the locks did not work (as shown in the trial) in an attempt to buy some food."  He pointed to his post-arrest statements and the polygraph test for corroboration of his lack of knowledge.  But in the end, he admitted, whether it "was naïve, stupid or completely negligent," he "did bring the bag which contained cocaine in this case to the parking lot of the Home Depot," and he accepted full responsibility for it.

At sentencing, the district court granted two of Morley's objections to the PSI's offense-level calculation.  First, it found Morley responsible for 3, rather than 3.518, kilograms of cocaine, which reduced his base offense level to 26 under U.S.S.G. § 2D1.1(c)(7).  Second, it awarded Morley a two-level minor role reduction under U.S.S.G. § 3B1.2, producing a new total offense level of 24.

The district court then found Morley did not qualify for safety-valve relief both because of his criminal history and his failure to truthfully provide the government with all the information he had concerning his offenses.  As to his criminal history, the district court interpreted § 3553(f)(1) as "disjunctive," meaning a defendant must not have any of (1) more than four criminal history points, (2) a prior three-point offense, *or* (3) a prior two-point

violent offense to qualify for relief. And because Morley had a prior three-point offense, the court found that he was not safety-valve eligible. As to his statement, the district court agreed with Morley's contention that the government's "belief regarding truthfulness" and noted that "perhaps" even "the jury's findings" did not prevent it from finding his statement truthful. Still, the district court disagreed that Morley provided a truthful and complete statement under § 3553(f)(5), particularly considering the government's "strong circumstantial case."

The district court found that Morley's total offense level of 24 and his criminal history category of II produced a guideline range of 57 to 71 months. Because the mandatory minimum sentence for his offenses was 60 months, however, the district court calculated the guideline range as 60 to 71 months. The government advocated for a 65-month term of imprisonment, citing Morley's prior 37-month sentence for his federal drug conviction and the need to promote deterrence, respect for the law, "and send a message that the defendant should not be dealing with drugs." Morley asked for the mandatory minimum sentence of 60 months. Before the district court imposed its sentence, it allowed Morley to provide a statement.

The district court sentenced Morley to two concurrent terms of 60 months' imprisonment on both counts, the mandatory minimum sentence for each count under § 841(b)(1)(B)(ii). This timely appeal followed.

## II.    STANDARDS OF REVIEW

A district court's denial of a motion to suppress evidence is reviewed under a mixed standard. *United States v. Jiminez,* 224 F.3d 1243, 1247 (11th Cir. 2000). We review the district court's findings of fact under the clearly erroneous standard and its application of law to those facts de novo. *Id.* We also give "due weight" to the inferences that the district court and law enforcement officers draw from the facts. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). When considering a ruling on a motion to suppress, we must construe all facts in the light most favorable to the party prevailing in the district court. *United States v. Behety,* 32 F.3d 503, 510 (11th Cir. 1994).

"We review de novo a [d]istrict [c]ourt's denial of judgment of acquittal on sufficiency of evidence grounds, considering the evidence in the light most favorable to the [g]overnment, and drawing all reasonable inferences and credibility choices in the [g]overnment's favor." *United States v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013) (emphasis omitted). We must affirm if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We also review de novo whether the circumstances of a particular case rendered it appropriate to instruct the jury on deliberate ignorance. *United States v. Stone*, 9 F.3d 934, 937 (11th Cir. 1993). But our review of jury instructions is deferential, and we will

reverse only "if we are left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Crabtree*, 878 F.3d 1274, 1289 (11th Cir. 2018) (quoting *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008)).

## III.    ANALYSIS

On appeal, Morley argues that: (1) the district court erred in denying his motion to suppress the evidence of the briefcase as the fruit of an unlawful search; (2) the evidence at trial was insufficient to support his convictions; (3) the district court erred in providing a deliberate ignorance jury instruction; and (4) the district court erred in denying him a safety valve sentence reduction. We address each of his challenges in turn.

### A.  The Motion to Suppress

Morley argues that Fred's retrieval of the briefcase from the passenger seat of Morley's car was an unconstitutional search in violation of the Fourth Amendment. It is undisputed that Fred's actions amounted to a warrantless search that implicated the Fourth Amendment's protections. We must determine, however, whether any exception to the Fourth Amendment's warrant requirement rendered the search constitutionally permissible. The district court specifically found that two exceptions applied: the automobile exception and the consent exception by way of apparent authority.

As an initial matter, Morley mischaracterizes the automobile and apparent authority doctrines as *requirements* that must be met for a valid search. Those doctrines, however, are separate

*exceptions* to the Fourth Amendment's warrant requirement, and either of which may provide an independent basis for us to affirm the denial of Morley's suppression motion. Here, we conclude that the district court did not abuse its discretion in finding that the automobile exception applied.

The automobile exception allows law enforcement to conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile and (2) law enforcement has probable cause to search it. *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007). All that is necessary to satisfy the first element is that the automobile is operational. *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). In *United States v. Nixon*, 918 F.2d 895 (11th Cir. 1990), this Court explained that "ready mobility" is "*inherent* in all automobiles that reasonably appear to be capable of functioning." *Id*. at 903 (emphasis in original); *see also United States v. Alexander*, 835 F.2d 1406, 1409 (11th Cir. 1988) (stating that the vehicle need not be moving at the moment when police obtain probable cause to search and that the ability of a vehicle to become mobile is sufficient). That requirement is met here because Morley drove the car to the scene, nor does Morley challenge that his vehicle was readily mobile. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (noting that a party abandons an issue by not raising it on appeal).

Turning to the second element, probable cause exists when, "under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the

vehicle." *Lindsey*, 482 F.3d at 1293 (citation omitted). For example, in *United States v. Lanzon*, 639 F.3d 1293 (11th Cir. 2011), we held that the district court did not err in denying Lanzon's motion to suppress because officers had probable cause to search Lanzon's truck pursuant to the automobile exception. *Id*. at 1300. In that case, Lanzon participated in instant message conversations with an undercover agent posing as "Tom." *Id*. Lanzon described to "Tom" his intent to have sex with a minor, and he agreed to meet "Tom" and the minor at a specific time and place and to bring colored condoms with him. *Id*. After driving his truck to the designated meeting place at the agreed-upon time, Lanzon approached the officers who were posing as "Tom" and the minor and said, "Tom, Tom." *Id*. Lanzon was then arrested, and a search of his person yielded no condoms. *Id*. The officers sought Lanzon's consent to search his truck, but he refused. *Id*. at 1297. The officers then searched the truck anyway—using Lanzon's keys to open it—and found the colored condoms, along with flavored lubricant and a receipt for the purchase of those items. *Id*. During his criminal proceedings, Lanzon filed to suppress the evidence seized from his truck, which the district court denied. *Id*. at 1299. On appeal, we held that, under the totality of the circumstances, there was a fair probability that evidence of a crime would be found in Lanzon's vehicle. *Id*. at 1300.

The facts and circumstances known to law enforcement here are similar to those in *Lanzon*. As in *Lanzon*, law enforcement here, via a confidential informant, engaged in conversations with Edgecombe that led to an agreement to meet at a specific time and

place for an illicit act. The only significant difference here is the involvement of a third party, Morley. But Morley arrived at the designated meeting place at the agreed upon time, minutes after Edgecombe had texted him to come, and after Edgecombe told Fred that the cocaine was on its way. When Morley arrived, it was clear that Edgecombe recognized him. Indeed, Edgecombe explicitly directed Fred to retrieve the cocaine from Morley's car. There was more than a reasonable probability that Fred would find contraband in the exact place that Edgecombe told him to look.

Morley's argument against probable cause relies heavily on one unpublished case, *United States v. Smith*, 596 F. App'x 804 (11th Cir. 2015), in which this Court affirmed a district court's finding that probable cause *existed*. *Id*. at 807. In *Smith*, this Court held that a police officer's credible belief that "he smelled marijuana coming from the car" of the defendant, whom he had just arrested for marijuana possession, sufficed to show probable cause to conduct a warrantless search of the vehicle. *Id*. Morley's argument largely consists of a recitation of the facts in *Smith* in an effort to distinguish it from the facts here. But there are multiple problems with Morley's approach. For starters, Morley fails to explain how an unpublished case in which this Court found that law enforcement acted reasonably establishes that law enforcement acted *unreasonably* here. Additionally, unlike the officer in *Smith*, Fred did not have to logically deduce that there might be contraband in the car based on smell or any other subjective factor. Fred searched Morley's car after Edgecombe first told Fred that the cocaine was on its way and then specifically directed him to "[g]o get" the

cocaine from Morley's passenger seat.  Thus, the probability that Fred would find contraband in Morley's car was no less than it was in *Smith*.

Morley also misconstrues both the standard of review and the legal test for probable cause.  Regarding the standard of review, he argues that it "is not improbable that no reasonable fact finder could accept" an alternative explanation.  Our review, however, does not ask whether there is some possible alternative explanation that a reasonable factfinder could have accepted.  Rather, we review the district court's findings of fact only for clear error, and we must give due weight to the inferences that the district court and law enforcement officers draw from those facts.  *Ornelas*, 517 U.S. at 699.  And when considering a ruling on a motion to suppress, we must construe all facts in the light most favorable to the party prevailing in the district court—here, the government.  *See Behety,* 32 F.3d at 510.

As to the proper legal test, Morley argues that he was merely used by Edgecombe as a pawn to unwittingly facilitate the September 28 deal.  This conclusion, he contends, is supported by the fact that Edgecombe unilaterally involved an innocent decoy for the prior August 6 drug deal.  But Morley's knowledge, or lack thereof, is irrelevant to the probable cause inquiry.  Instead, it is "the facts and circumstances within [law enforcement's] knowledge" that matter.  *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (quoting *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995)).  Even if Morley were "unwittingly duped" into bringing the cocaine to the

deal, his supposed lack of knowledge has no bearing on law enforcement's knowledge as to the probability that Morley's car contained cocaine.

Under the totality of the circumstances, the facts and circumstances that were known to law enforcement at the relevant time supported a fair probability that cocaine would be found in Morley's vehicle. Edgecombe had previously sold Fred half a kilogram of cocaine, and Fred and Edgecombe had no other relationship besides that of customer and drug dealer. Turning to the night of September 28, Fred and Edgecombe had negotiated an $84,000 drug deal, and Edgecombe made it clear to Fred that he was not working alone. Edgecombe consistently asked Fred to go straight to "the guy who was holding the dope." And on the night of the deal, Edgecombe asked Fred to drive with him to a different location to get the cocaine from another person. After Fred refused, Edgecombe told Fred that his associate was bringing it to them at the Home Depot. Shortly afterward, Morley arrived, and parked his vehicle close to Edgecombe and Fred's cars. Edgecombe then directed Fred to retrieve the drugs from the passenger seat of Morley's car. This was more than enough to establish probable cause under the automobile exception.

Because both elements of the automobile exception were satisfied, law enforcement was authorized to conduct a warrantless search of Morley's car. *Watts*, 329 F.3d at 1286. We therefore affirm the district court's denial of Morley's motion to suppress.

### B.    Sufficiency of the Evidence

Morley next challenges the sufficiency of the evidence supporting his convictions for conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Morley argues that the evidence here was solely circumstantial and that it was insufficient for a reasonable jury to find him guilty beyond a reasonable doubt.  Specifically, Morley argues that the prosecution failed to prove that he was a willing participant in the conspiracy and that he knew that the briefcase contained cocaine.

Both of the offenses for which Morley was convicted have a guilty knowledge element.  The conspiracy charge under § 846 required the government to prove: (1) the existence of an illegal agreement between two or more people to distribute cocaine; (2) that Morley knew of the agreement and its goal; and (3) that Morley knowingly joined or participated in the agreement. *See United States v. Brown*, 587 F.3d 1082, 1089 (11th Cir. 2009).  And the substantive possession charge under § 841(a)(1) required the government to prove that Morley knowingly possessed cocaine and intended to distribute it. *United States v. Mercer*, 541 F.3d 1070, 1076 (11th Cir. 2008).  Because guilty knowledge can rarely be established directly, however, "a jury may infer knowledge and criminal intent from circumstantial evidence alone." *United States v. Duenas*, 891 F.3d 1330, 1334 (11th Cir. 2018).

Morley argues that the circumstantial evidence here is not enough to support an inference of knowledge.  He contends that

this is a case of "guilt by association," and that close association with a co-conspirator or mere presence at the scene of the crime is insufficient evidence to prove knowing participation in a conspiracy. Morley is correct that "[n]either association with a co-conspirator nor presence at the scene of a crime, standing alone, will support a finding of specific knowledge." *Id.* (citing *United States v. Louis*, 861 F.3d 1330, 1333 (11th Cir. 2017)). But "presence nonetheless is a probative factor which the jury may consider in determining whether a defendant was a knowing and intentional participant in a criminal scheme." *United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005) (quoting *United States v. McDowell*, 250 F.3d 1354, 1365 (11th Cir. 2001)).

Relying mainly on our decision in *United States v. Sullivan*, 763 F.2d 1215 (11th Cir. 1985), Morley argues that his association with Edgecombe along with his presence at the scene is insufficient to support his convictions. In *Sullivan*, six codefendants were convicted of conspiring to import marijuana from Columbia and distribute it in the United States. *Id.* at 1216. The plan was to fly the marijuana to Florida, and then at the airport landing strip, to offload that marijuana into vans. *Id.* at 1216–17. Those vans would then deliver the marijuana to other drivers who would be waiting at a nearby hotel and would keep distributing the marijuana. *Id.* All six codefendants appealed the sufficiency of the evidence supporting their conspiracy convictions, but this Court found that only one codefendant, Martos, raised a legitimate challenge. *Id.* at 1218.

This Court summarized the evidence related to Martos as follows. Drug Enforcement Administration agents saw Martos in a hotel parking lot near a red van. *Id*. at 1219. A codefendant, Martinez, arrived in a blue van and walked over to Martos. *Id*. Martos and Martinez then walked over to two other codefendants, and all four walked around the parking lot for about five minutes. *Id*. Martos and Martinez went to the blue van and one of them, though it was never established who, removed a small bag from the van. *Id*. The two then went into the hotel lounge. *Id*. All four of them were later arrested, including Martos. *Id*. When Martos was arrested, he was with Martinez who was carrying the small handbag, which was found to contain a pistol. *Id*. There was no marijuana found at the scene of arrest because the plan was for other conspirators to offload the marijuana from the planes and transport it to the hotel to meet separate drivers who would distribute it to various other points. *Id*. at 1217. Therefore, though the police knew that some alleged conspirators would be drivers in the hotel parking lot awaiting other conspirators delivering marijuana from the airport, there was no evidence as to who the drivers at the hotel would be. *Id*.

We reversed Martos's conviction because there was no evidence that Martos knew of the existence of the conspiracy or that he knew that the van was intended to transport marijuana. *Id*. His conviction, rather, was seemingly based only "on his presence at the scene in the [hotel] parking lot." *Id*. He was never "observed doing anything from which the jury could draw an inference that he was a member of the conspiracy." *Id*.

Morley contends that this case is similar to Martos's in *Sulli-van* because there was no evidence that Morley knew Edgecombe was planning to sell cocaine on August 6 or September 22 or that Morley knew Edgecombe's briefcase contained cocaine that Edgecombe would instruct Fred to retrieve from Morley's car. In-stead, Morley argues, he merely believed that he was meeting his friend, Edgecombe, after they scheduled a meeting at Home Depot for Morley to return the case left in his car. Morley points out that neither his DNA nor latent fingerprints were found on the cocaine or briefcase, so there was insufficient proof that he knew that he was transporting cocaine.

The circumstantial evidence here, however, is far greater than it was in *Sullivan* and was more than sufficient for the jury to infer Morley's knowledge. For starters, no marijuana was recov-ered at the scene of arrest in *Sullivan*, so it was much more attenu-ated to impute, to Martos, knowledge of a conspiracy to distribute drugs that Martos never physically possessed. In this case, it is un-disputed that Morley was in physical possession of the three kilo-grams of cocaine and that he transported the cocaine to the scene of the drug deal at the time it was supposed to occur. The only issue is whether a reasonable jury could have inferred that Morley knowingly agreed to do so despite his contention that he was an unsuspecting pawn. While knowledge requirements may vary widely based on the individual facts of each case, a jury can infer knowledge using certain guideposts, such as whether "a defendant was instrumental to a plan's success, had ample opportunities to discover the critical fact, and was in frequent contact with someone

who knew that fact." *United States v. Colston*, 4 F.4th 1179, 1190 (11th Cir. 2021). Viewed in the light most favorable to the verdict, a reasonable jury could have found that Morley knew of the plan to deliver cocaine to a drug deal.

Morley played an instrumental role in the plan's success. Edgecombe relied on Morley to deliver $84,000 worth of cocaine to a drug deal that Edgecombe had been discussing with Fred for over a month. And a prudent drug dealer is not likely to entrust the delivery of costly amounts of drugs to unwitting participants. In fact, we have repeatedly held that because "'a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders,' when the orchestrator of a conspiracy vests substantial trust in an associate to contribute to the scheme, a jury may infer the associate's knowing participation." *Duenas*, 891 F.3d at 1334 (quoting *United States v. Cruz-Valdez*, 773 F.2d 1541, 1547 (11th Cir. 1985) (en banc)). The deal's success depended on Morley delivering the cocaine. He did so, arriving at the designated meeting site, at the designated meeting time, minutes after Edgecombe directed him to show up.

Morley's communications with Edgecombe further support the inference of knowledge. On the day of the drug deal, Morley was in consistent contact with Edgecombe, who had brokered the cocaine deal with Fred. Morley's phone records showed that he and Edgecombe called each other fifteen times, including multiple phone calls after Edgecombe had sent Morley the Home Depot address. The communications leading up to the September 28 deal suggested Morley's knowledge, too. On September 22, Fred and

Edgecombe had a conversation at 10:01 a.m. about a deal for six kilograms of cocaine. During that call, Edgecombe told Fred that "it still isn't really in place yet." Fred explained that he wanted to know when it would be ready because he had "business" in Orlando. After that call, Edgecombe and Morley spoke twice on the phone, once at 10:06 a.m. and again at 10:13 a.m. A minute after Edgecombe's second call with Morley, Edgecombe called Fred again and told him he would send him "straight" and "directly" to the person with the cocaine.

On the day of the August 6 deal, Edgecombe shared with Morley the address of the Bass Pro Shops. In addition, a few days before the August 6 drug deal, Edgecombe sent Morley two cryptic text messages: "I want you ride with me to deal with something also make yourself available," and "whenever i call you i want ride with me." In *Duenas*, we found similar messages to be a relevant indicator of the defendant's knowledge. 891 F.3d at 1335. Specifically, the defendant in *Duenas* texted his girlfriend two days before the transaction "that he was 'going to do a special work,' which he suggested would be lucrative for him." *Id*. His girlfriend "responded, 'Good luck. God protect you and guide you,'" which this Court found to be an indicator of the defendant's "knowing assumption of a palpable risk." *Id*. The August 6 messages here are similar to those in *Duenas*. Edgecombe urging Morley to make himself available to ride with Edgecombe to deal with something whenever Edgecombe called, a few days before the first drug deal, could support an inference of Morley's knowledge of the circumstances. When paired with the communications leading up to, and

on the date of, the September 28 drug deal, the frequency and the timing of the calls suggested Morley was a knowing participant.

Despite Morley's arguments to the contrary, the circumstantial evidence here went far beyond Morley's mere presence at the scene or his close association with Edgecombe. Morley showed up at the designated meeting site, at the designated meeting time, minutes after Edgecombe directed him to come. He was entrusted with delivering the cocaine, so he was instrumental to the deal. His communications with Edgecombe, a knowing participant, were frequent and suspiciously timed. In totality, a jury could reasonably infer Morley's knowing involvement in the cocaine conspiracy on these facts. The trial evidence was thus sufficient to support his convictions, and we affirm as to this issue.

### C.    Deliberate Ignorance Instruction

Morley also challenges the district court's decision to provide a jury instruction on deliberate ignorance. The district court instructed the jury on both actual knowledge and deliberate ignorance because the evidence "equally could be consistent with actual knowledge or deliberate ignorance." The district court pointed to Morley's actions, such as his walking away from the car, and the way the drugs were packaged.

A deliberate ignorance instruction is appropriate when the facts "support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Rivera*,

944 F.2d 1563, 1571 (11th Cir. 1991) (quoting *United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir. 1987)). We have cautioned the district courts against instructing juries on deliberate ignorance when the evidence only points to either actual knowledge or no knowledge on the part of the defendant. *Stone*, 9 F.3d at 937 (citing *Rivera*, 944 F.2d at 1570–71). But it is not error "when the evidence could support both actual knowledge or deliberate ignorance and the jury was instructed on both." *United States v. Maitre*, 898 F.3d 1151, 1157 (11th Cir. 2018).

Morley argues that the evidence only supported an actual-knowledge theory and points to our decision in *United States v. Perez-Tosta*, 36 F.3d 1552 (11th Cir. 1994) for support. There, the defendant had driven a "cocaine-laden" truck to a house and "was present while seventy kilograms of cocaine were taken off the truck and placed in the bedroom of the house." *Id*. at 1565. Because the only inference a jury could draw from this evidence was that the defendant's presence during such a large movement of cocaine meant that he "had to have been aware of it," we held that the district court erroneously gave a deliberate ignorance instruction. *Id*.

But the facts here are different from *Perez-Tosta*. Unlike the defendant in *Perez-Tosta*, Morley attempted to distance himself from the deal as it took place. Morley received a text message from Edgecombe with the address of the Home Depot and, within minutes, left his house and drove there with a briefcase containing three kilograms of cocaine on his passenger seat. When Morley arrived, however, he did not attempt to find Edgecombe. Instead,

he quickly exited his vehicle and walked across the street to a Wendy's restaurant. After realizing that the Wendy's was closed, Morley paced around outside and eventually made his way across the street to help a family with car troubles. Consequently, Morley was not present when Fred retrieved the three kilograms of cocaine from Morley's car, or when Fred gave Edgecombe the $84,000 for that cocaine. These facts supported the alternative inference that Morley was aware of a high probability that he had delivered cocaine to a drug deal and had been trying to avoid learning all the facts in order to have a defense in a subsequent prosecution. Morley's actions therefore warranted the deliberate ignorance instruction.

In any event, the district court instructed the jury that it could convict if Morley had actual knowledge *or* deliberate ignorance. If, as Morley contends, there was insufficient evidence that he was deliberately ignorant of the contents of the briefcase, then our precedent is clear that the jury must have convicted on the alternative theory—actual knowledge. *See Colston*, 4 F.4th at 1192 (citing *Stone*, 9 F.3d at 938). Thus, even if the district court erred in giving the deliberate ignorance instruction, it was harmless. *See id.* In any event, Morley's challenge to the jury instruction fails.

### D.    Safety Valve Reduction

Finally, Morley argues that the district court erred in its determination that he was ineligible for a safety valve sentence reduction under the First Step Act. *See* 18 U.S.C. § 3553(f). The district court denied Morley a safety valve reduction on two grounds: (1)

Morley did not satisfy § 3553(f)(1) because he had a prior 3-point offense and (2) Morley did not satisfy § 3553(f)(5) because his safety valve statement was insufficiently truthful and complete.[1] In light of the Supreme Court's recent decision in *Pulsifer v. United States*, 144 S. Ct. 718 (2024), the district court's first basis for denying safety valve relief was correct.

At the time of sentencing, there were competing interpretations as to whether § 3553(f)(1) was conjunctive or disjunctive. After noting that the issue was "still not settled by the Eleventh Circuit," the district court landed on the disjunctive side of the debate and based its first ground for denying safety valve relief on that finding. Shortly after Morley was sentenced, this Court released its *en banc* decision in *United States v. Garcon*, 54 F.4th 1274 (11th Cir. 2022) (en banc), *abrogated by Pulsifer*, 144 S. Ct. 718. Vacating a prior panel decision that reached the opposite conclusion, our *en banc* Court determined that § 3553(f)(1) was "conjunctive" such that defendants were only disqualified from safety valve relief due to prior convictions if they had all of the criminal history features under subsection (f)(1). *Id.* at 1276.

On appeal, Morley argued that *Garcon* invalidated the district court's first basis for denying safety valve relief and, as to the second basis, that the district court clearly erred in finding that he failed to satisfy § 3553(f)(5). The government conceded that, after

---

[1] The relevant statutory provisions, along with the conjunctive versus disjunctive interpretative divide, are detailed in the Factual & Procedural Background.

*Garcon*, the district court's first basis for denying safety valve relief would have been incorrect. However, the government argued that we should affirm on the district court's alternative rationale that Morley's safety-valve statement was insufficient under § 3553(f)(5). Therefore, the only issue that we would have needed to consider is whether the district court erred in its § 3553(f)(5) determination. We only needed to reach that argument, however, if Morley was otherwise eligible for the safety valve reduction. But the Supreme Court's recent decision in *Pulsifer* expressly abrogated our decision in *Garcon* and held that a defendant who has *any* of the three criminal-history components under § 3553(f)(1) is disqualified from safety valve sentencing relief. 144 S. Ct. at 737.

It is undisputed in this appeal that Morley fails to satisfy § 3553(f)(1)(B) because he has a prior three-point offense—conspiracy to import 100 kilograms or more of marijuana. Therefore, Morley is ineligible for the safety valve reduction in light of *Pulsifer*. We thus affirm the district court's denial of Morley's request for a reduced sentence.

## IV.    CONCLUSION

For these reasons, we affirm Morley's convictions and sentence.

**AFFIRMED.**