**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-14115

Non-Argument Calendar

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

TOOCHUKWU MICHAEL OKORIE,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:19-cr-00626-MHH-NAD-3

————————————

Before NEWSOM, BRANCH, and BRASHER, Circuit Judges.

PER CURIAM:

Toochukwu Okorie appeals his conviction and sentence for conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h) and 1957. He argues on appeal that (1) venue was not

proper in the Northern District of Alabama; (2) there was a material variance between the indictment and the proof at trial as to whether a single conspiracy existed; (3) the district court abused its discretion by admitting evidence of Okorie's prior convictions and grand jury testimony under Federal Rule of Evidence 404(b); (4) the district court erred in giving a deliberate ignorance instruction; (5) the district court violated Okorie's Fifth and Sixth Amendment rights by imposing certain guidelines enhancements based on judicial fact-finding; (6) his sentence is procedurally and substantively unreasonable; and (7) the district court erred when it ordered the immediate payment of restitution.    After careful review, we affirm.

## I.    Background

Due to the complexity of the case and the number of claims on appeal, we divide our background discussion into three primary sections for ease of reference: (A) the indictment and pretrial motions; (B) the trial; and (C) sentencing.

### A.  The Indictment and Pretrial Motions

In 2019, a grand jury in the Northern District of Alabama indicted Okorie, Etinosa Omorusi, and Edafe Peters Igben on several counts related to a wire fraud and money laundering conspiracy.  Specifically, Count 1 charged Omorusi and Igben with conspiracy to commit wire fraud; Count 2 charged Omorusi, Igben, and Okorie with conspiracy to commit money laundering; and Counts 3 and 4 charged Omorusi with aggravated identity theft.  The indictment alleged that, from approximately June 2017

to May 2019, Omorusi, Igben, and Okorie, along with others known and unknown, "were part of an international criminal conspiracy" that targeted people across the United States, including in the Northern District of Alabama, with fraud schemes, including business e-mail compromise schemes and online romance schemes. They deceived victims into sending money to bank accounts controlled by the conspiracy and used for money laundering. As for conspiracy to commit money laundering,[1] the indictment alleged that Okorie, Omorusi, and Igben, "willfully and knowingly . . . engage[d] and attempt[ed] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that was derived from . . . [w]ire [f]raud."

Okori pleaded not guilty and filed a motion to dismiss the indictment for improper venue. He argued that venue was improper in the Northern District of Alabama as to Count 2 because the money laundering conspiracy did not take place in Alabama, and it was unclear whether any of the victims were in Alabama. Alternatively, he argued that, even if the Northern District of Alabama was a proper venue based on the broader conspiracy, venue remained improper as to him specifically because the acts committed by his co-conspirators that were linked to Alabama occurred prior to him joining the conspiracy.

A magistrate judge issued a report and recommendation ("R&R"), recommending that the motion be denied because under

---

[1] Count 2 is the only one in which Okorie was charged and is therefore the only one at issue on appeal.

4                    Opinion of the Court                    24-14115

our precedent in *United States v. Snipes*, 611 F.3d 855 (11th Cir. 2010), whether venue is proper is a question for the jury to decide. The district court adopted the R&R over Okorie's objections and denied his motion to dismiss.[2]

Prior to trial, the government filed a notice that it intended to introduce under Federal Rule of Evidence 404(b) evidence of Okorie's prior convictions for wire fraud and money laundering and his grand jury testimony from that case to establish Okorie's "intent, knowledge, absence of mistake, and lack of accident." Okorie objected, arguing that the probative value of his prior convictions was substantially outweighed by the danger of prejudice, and his grand jury testimony was of no probative value and constituted improper character evidence. The district court reserved its ruling until the trial.

### B. The Trial[3]

At trial, FBI Agent Special Agent Brian Marsh testified that in a business e-mail compromise scheme, "a third-party inserts themselves into e[-]mail communication between a customer and a service provider with the ultimate intention of taking a payment that the customer would pay to the service provider and moving it

---

[2] Consistent with the district court's order, the jury was instructed at trial that, for purposes of establishing venue, the government had to prove by a preponderance of the evidence that at least one act in furtherance of the charge occurred in the Northern District of Alabama.

[3] We provide additional subheadings concerning the trial testimony and proceedings as necessary for clarity.

into a bank account controlled by the third-party." Once the money is in the third-party controlled account, it is then moved "very quickly" to other accounts by either "a witting . . . or an unwitting conspirator." "A romance scam is where an individual preys on somebody romantically to either take their money or to get them to do something on their behalf, be it move money or just take what's theirs." Furthermore, victims of romance scams are often used to move money on behalf of individuals conducting business e-mail compromise schemes.

### i.    The business victims

Brian Daniels testified that he was the corporate claims manager for Coca-Cola Bottling Company United ("CCBCU"), a company located in Birmingham, Alabama. CCBCU had a third-party administrator, CCMSI, that handled CCBCU's liability claims, such as worker's compensation. CCMSI submitted monthly invoices to Daniels via e-mail for payment for services rendered. CCBCU would pay the invoices by mailing a physical check to an address in Indiana per CCMSI's instructions. However, in July 2018, Daniels received an e-mail that purportedly came from his CCMSI contact with new wiring instructions for all current and future invoices. The e-mail indicated that CCMSI's old bank account had a hold on it because "a dud check was paid into another vendor" and CCMSI would no longer be accepting checks. The instructions directed that payments be wired to a Citizens

6                    Opinion of the Court                    24-14115

Bank account in Pennsylvania.[4]  Daniels forwarded the e-mail to the accounting department, and CCBCU paid the invoice according to the new wiring instructions.

Another CCBCU employee in the accounts payable department testified that, in September 2018, he received different wiring instructions from CCSMI, which directed that payments be wired to a SunTrust account because CCMSI's prior bank account had been closed "due to a dud check deposited by another vendor."[5]

Later, CCBCU discovered that the e-mails with the new wiring instructions were fraudulent and had not been sent by a CCMSI employee—an extra "i" had been added to CCMSI's e-mail address—and the bank accounts to which CCBCU had wired the payments did not belong to CCMSI.

Eric Wong, a staff accountant with ABD, an insurance brokerage firm, testified that he paid invoices from insurance carriers on behalf of ABD.  On October 23, 2018, he received an e-mail purportedly from XL Insurance that contained a change in

---

[4] Unbeknownst to CCBCU, this account belonged to one of the romance scam victims, Sokchea Mam Chum.  As we discuss further in this opinion, Chum then wired the funds into accounts belonging to other members of the conspiracy at the directive of the person she was communicating with as part of the romance scam.

[5] The SunTrust account belonged to one of the romance scam victims, Tonya Helton.  As we discuss further, after receiving the funds, Helton wired money to various accounts, including one belonging to Okorie's business, at the directive of the person she was communicating with.

24-14115              Opinion of the Court                    7

banking instructions.  The instructions directed ABD to wire its payment to a SunTrust bank account.[6]  ABD wired the money to the new account.  Three days later, Wong received another e-mail purportedly from XL Insurance stating that the payment ABD just made "should be recalled" and deposited into a new account along with all future payments, "due to the fact that [XL's] previous Suntrust bank account on file has been placed on hold indefinitely because of a dud check deposited into it by another vendor." ABD's corporate controller did not approve the request, and noticed that the XL insurance e-mail address subtly misspelled.[7]

Peter Dreyfuss, a commercial real estate developer in California, testified that a person named Andrew Burton contacted him and offered him a deal on a large loan to finance the purchase of a hotel in New York City.  However, Dreyfuss would have to pay an up-front fee of $75,000.  When Dreyfuss told Burton that he did not have the money, Burton said he would "take care of it," and he wired several transfers into Dreyfuss's business account in November 2018.  Burton then instructed Dreyfuss to wire the

---

[6] Unbeknownst to ABD, this account belonged to romance scam victim Helton.

[7] A similar scheme was executed in August 2018 on Computer Solutions East ("CSE").  CSE received a fraudulent e-mail from a person allegedly with Microsoft about a payment due.  Like the schemes involving CCBCU and ABD, Microsoft's e-mail address was subtly misspelled.  The e-mail contained new wiring instructions, directing the payment to be wired into a Citizens Bank account.  This Citizens Bank account was the same account included in the CCBCU July 2018 wiring instructions, and it belonged to Chum, one of the romance scam victims.

money to certain accounts.  One of these wires went to a Citizens Bank account belonging to TMO Consulting, LLC, a company owned by Okorie.  Dreyfuss's bank froze his account and ultimately closed it because the transactions were "fraudulent." Dreyfuss did not know who Burton was and never met him in person.

Patricia Davis testified that, in 2017, she was working as a real estate broker in Montana when a person named Sang Soo Kim contacted her about buying farm and ranch property for approximately $35 million.  Kim indicated that he was from South Korea, and he wanted Davis to oversee the properties for him.  Kim told her that his money was "tied up in banks," and he needed her assistance to help "untie" his money.  Davis met a representative of Kim on two occasions and gave him cash totaling approximately $160,000.   She also wired funds to an account belonging to Collective Intelligence Forensics, another business owned by Okorie.

### ii.   The romance scam victims

Susan Polson testified that she was a retired teacher and lived in Iowa.  In the summer of 2016, Polson was "contacted on Facebook by an individual using the name James Anderson." Anderson asked her for money on multiple occasions, and she complied.  For instance, in 2017, she wired him $20,000 from her bank account to a PNC bank account belonging to TMO Consulting (Okorie's business).  PNC bank flagged the transfer, and it did not go through, and the money was returned to Polson.  After

that, Anderson instructed Polson to meet an individual in person and give him the money. Polson complied and met an unknown man outside the local airport and gave him $23,000 in cash. In total, she sent between $80,000 and $83,000 to Anderson over a six-month period. She never met Anderson in person and did not know who he was.

Sokchea Mam Chum testified that she lived in New Jersey, and she was contacted by an individual using the name Danh Hoang on Facebook. They began communicating, and he asked her for money. When she told him that she did not have any money, he asked her to transfer money for him instead to help him pay people that he owed money. In August 2018, she received a wire for $98,500.67, and the description of the wire stated it was from "Coca-Cola"—this was the payment from CCBCU. She received a second wire transfer for $54,364.07 a few days later. She then wired out the funds to other bank accounts as directed by Hoang, including accounts belonging to Paulinus Ebhodaghe doing business as Ebhos Auto and a bank account in Nigeria belonging to Ohimai Asikhia doing business as Ohimai D Minister.[8] Chum did not know who was impersonating Hoang.

---

[8] A digital forensic examiner analyzed WhatsApp messages between a cell phone number registered to Asikhia and a phone number belonging to Ebhodaghe (and listed as the number for Ebhos Auto). These messages referred to various banks and instructions such as, "Say y u send me money tell them say na for car." The messages also contained two links to articles related to the prosecution of individuals in bank fraud, wire fraud, and romance fraud schemes.

Tonya Helton testified that she lived in Tennessee, and in 2018, she was contacted on Instagram by a person using the name Mark Sinclair, otherwise known as the actor Vin Diesel. He told her he was doing charity work and asked her to send and receive donations on his behalf via wire transfers. In August 2018, she opened up a SunTrust account to assist with this endeavor. She received a wire for $160,890. She wired $156,000 to a Capital One bank account belonging to TMO Consulting (Okorie's business) based on Sinclair's instructions. She did not know who was impersonating Sinclair.[9]

Similarly, Nakita Jones testified that, in 2017, while living in Birmingham, Alabama, "a person using the name Mark or Vin Diesel" contacted her on Instagram. They began communicating, and eventually he asked her for money. Mark also asked her to receive money via Western Union or MoneyGram on his behalf and send it to different people. She complied until she realized that "things . . . didn't add up."

### iii.    Okorie and his bank accounts

Stephanie Fitzgibbons, an FBI forensic accountant and a certified fraud examiner, testified that Okorie had a master's degree

---

[9] Law enforcement believed that codefendant Omorusi was the owner of the Mark Sinclair e-mail account because (1) the recovery e-mail address for the Mark Sinclair account was "omorusietinosa@gmail.com"; (2) the associated recovery phone number had a country code for Nigeria and Omorusi was from Nigeria; (3) the IP address linked to the account came from Nigeria; and (4) the account contained a picture of Omorusi's passport.

and he was previously a certified fraud examiner.[10] Business records from Pennsylvania confirmed that Okorie was the sole organizer of the companies Collective Intelligence Forensics and TMO Consulting, LLC.

Between February 2016 and March 2019, Okorie opened ten bank accounts at seven different financial institutions for TMO Consulting and Collective Intelligence Forensics. During roughly the same period, Okorie also had nine personal bank accounts with five different financial institutions.

TMO Consulting's account at PNC bank was the one that Polson wired $20,000 to, but PNC's security flagged the transaction, returned the money, and closed TMO Consulting's account. Another TMO Consulting account at Capital One bank received a wire transfer from Helton for $156,000 on October 26, 2018. Following the deposit, between October 26 and November 5, 2018, various checks were issued depleting the account's balance. These checks included: (1) a $32,800 payment to TMO LLC; (2) a $17,500 payment to Okorie himself; (3) a $10,000 payment to Delphi Exports, LLC; (4) a $33,200 payment to TMO LLC; and (5) a $24,800 payment to TMO LLC.[11] The above-referenced checks to TMO LLC were deposited into another of TMO Consulting's accounts at Citizens Bank, and Okorie was the only authorized

---

[10] Okorie's fraud examiner license was suspended in 2009.

[11] There were also several smaller withdrawals that appeared to be related to personal expenses, such as a payment to Verizon, Comcast, credit card and loan payments, and a grocery store charge.

signatory. Between October 26 and November 6, 2018, multiple checks or withdrawals were then made from that Citizens Bank account, including a $14,500 payment to Ebhos Autos.

Fitzgibbons further testified that she reviewed account information for Okorie's personal bank account with Citizens Bank. Okorie was the only signatory on this account as well. As of October 24, 2018, Okorie's personal Citizens Bank account had a balance of $345.84. The account showed the receipt of the $17,500 check from TMO Consulting's Capital One account on October 29, 2018. Between October 29 and November 6, 2018, Okorie made a series of payments or withdrawals that depleted most of the money in the account.

Another of TMO Consulting's accounts at Citizens Bank had a balance of approximately $200 on November 13, 2018. It received $130,000 from Dreyfuss Capital Partners LLC on November 14, 2018. [*Id.*] Almost $20,000 was transferred between November 14 and November 15 to Okorie's personal bank account. A total of $42,000 was transferred to another TMO Consulting account with Citizens Bank between November 14 and November 16. And two substantial payments were made to Ebhos Auto totaling over $52,000 between November 15 and November 21.

Fitzgibbons also analyzed a Chase account for Okorie's other business, Collective Intelligence Forensics. That account received five wire transfers for several thousand dollars each from Patricia Davis between April and June 2019. For instance, at the beginning of April 2019, Collective Intelligence Forensics's account

had only $40 in it.  Then, Davis wired $10,000 and $3,975 to the account between April 4 and April 10.  After that influx of cash, there were several cash withdrawals, credit card payments, some food purchases, living expenses, and a $1,000 check to Okorie himself.

Throughout the trial, Okorie argued that there was no connection between himself and the co-conspirators or the victims; that he lacked the necessary intent; and that he had no knowledge that the proceeds wired into his account were fraudulent.

### iv.    The Rule 404(b) evidence

Over Okorie's objection, the government introduced evidence under Rule 404(b) that (1) Okorie pleaded guilty to three counts of wire fraud and three counts of money laundering in 2011 in the Eastern District of Pennsylvania, and that Okorie was sentenced to 54 months' imprisonment and ordered to pay $1,727,376.10 in restitution, and (2) his grand jury testimony from that case.  As part of his grand jury testimony in the 2011 case, Okorie admitted that he knowingly laundered proceeds from lottery scams initiated by other people through his businesses, including a Western Union he owned and his consulting firm, Collective Intelligence Forensics.

With regard to the Rule 404(b) evidence, the jury was instructed that:

> [d]uring the trial, you heard evidence of acts allegedly done by Mr. Okorie on other occasions that may be similar to the acts with which Mr. Okorie is currently

charged.  You must not consider any of this evidence to decide whether Mr. Okorie engaged in the activity alleged in the superseding indictment.  This evidence is admitted and may be considered by you for the limited purpose of assisting you in determining whether Mr. Okorie had the state of mind or intent necessary to commit the crime charged in the superseding indictment, the motive to commit the acts charged in the superseding indictment, that Mr. Okorie acted according to a plan or in preparation to commit a crime as charged in the superseding indictment, or the defendant committed the acts charged in the superseding indictment by accident or mistake.

### v.    *The deliberate ignorance instruction*

Okorie objected to the district court giving a deliberate ignorance jury instruction, arguing that such an instruction was not warranted by the evidence.  The district court denied the objection and instructed the jury that:

> [i]f a defendant's knowledge of a fact is an essential part of the crime, it's enough that the defendant was aware of a high probability that the fact existed, unless the defendant actually believed the fact didn't exist. . . .

> "Deliberate avoidance of positive knowledge"—which is the equivalent of knowledge—occurs, for example, if a defendant possesses a package and believes it contains a controlled substance but deliberately avoids learning that it contains the

controlled substance so he or she can deny knowledge of the package's contents.

So you may find that a defendant knew about the unlawful purpose of the plan to violate 18 U.S.C. § 1957 if you determine beyond a reasonable doubt that the Defendant (1) actually knew about the unlawful purpose of the plan . . ., or (2) had every reason to know but deliberately closed his eyes.

The jury found Okorie guilty of conspiracy to commit money laundering.

## C. Sentencing

Prior to sentencing, the United States Probation Office prepared a presentence investigation report ("PSI"). The base offense level for the money laundering conspiracy was 20. Okorie received additional guidelines enhancements for being "in the business of laundering funds," pursuant to U.S.S.G. § 2S1.1(b)(2)(C), and because the offense involved "sophisticated These enhancements increased the total offense level to 26, which when combined with Okorie's criminal history category of II resulted in an advisory guidelines range of 70 to 87 months' imprisonment. He faced a statutory maximum of 10 years' imprisonment. In terms of his financial condition, the PSI indicated that Okorie had $596,550 in assets (checking and savings accounts, stocks, property, and land), and $480,632 in liabilities, making his net worth $115,918. The PSI indicated that the guideline fine range for the offense was $25,000 to $250,000, and that Okorie "[did] not have the ability to pay a fine."

Okorie objected to the two guidelines enhancements, arguing that he engaged in legitimate business and was not in the business of laundering funds and that the offense did not involve sophisticated means of laundering. He maintained that without these enhancements, his guidelines range would be only 37 to 46 months' imprisonment.

Okorie filed a sentencing memorandum requesting a 37-month sentence. He asserted that the two persons responsible for perpetrating this scheme were Ebhodaghe and Asikhia and they were sentenced to 37 and 18 months, respectively. Thus, he maintained that he should receive a similar sentence and that a sentence within his guidelines range of 70 to 87 months' imprisonment would create an unwarranted sentencing disparity.

At sentencing, after hearing arguments from both parties, the district court overruled Okorie's objections to the guidelines enhancements and adopted the PSI's guidelines range. Okorie urged the court to consider that, since his release in his prior case, he had "liv[ed] a law-abiding life" with his wife and children, and "he was doing his very best to make his way in a very difficult environment after being convicted previously." He also reiterated his argument that he should receive a sentence similar to Ebhodaghe and Asikihia, noting that they did the "lion['s] share of the conduct" in the scheme and profited more than he did.

The government, in turn, requested a sentence of 87 months' imprisonment, highlighting the vulnerable victims that were the subject of the romance scheme and that Okorie was a

24-14115                Opinion of the Court                17

recidivist "professional money launderer." The government further noted that there was no evidence that Ebhodaghe and Asikhia received larger shares of the profits, but regardless, they were not similarly situated to Okorie because they cooperated with the government by "proffer[ing] multiple times," and they had no criminal history.

The district court varied upward and imposed a sentence of 108 months' imprisonment to be followed by three years' supervised release. The court acknowledged that this sentence was "twice the original sentence" that Okorie received for his 2011 conviction. Nevertheless, the court noted that "[t]he conduct in this case [was] bad" and explained that "[Okorie] took advantage of people and allowed that to go on by [his] support[] [of] the frauds as they [went] on." The court emphasized that the sentence was appropriate based on the nature and circumstances of the offense, Okorie's personal history and characteristics, including the fact that he was a recidivist, and to deter Okorie's future criminal conduct.[12] Finally, the court ordered Okorie to pay $30,713 in restitution to victim Patricia Davis immediately. Okorie objected to the reasonableness of the sentence.

---

[12] Consistent with these oral reasons, the district court explained in the statement of reasons that it varied upward from the guidelines range because of the "nature and circumstances of the offense"; "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; and "to afford adequate deterrence." The court further noted that it "considered [Okorie's] recidivism and doubled prior sentence to afford adequate deterrence to this defendant."

This appeal followed.

## II.    Discussion

Okorie argues that (1) venue was not proper in the Northern District of Alabama; (2) there was a material variance between the indictment and the proof at trial as to whether a single conspiracy existed; (3) the district court abused its discretion by admitting evidence of Okorie's prior convictions and grand jury testimony under Rule 404(b); (4) the district court erred in giving a deliberate ignorance instruction; (5) his sentence was procedurally and substantively unreasonable; and (6) the district court erred when it ordered the immediate payment of restitution.  We address each argument in turn.

### A.  Venue Claim

Okorie argues that the district court erred in finding that venue was proper in the Northern District of Alabama because (1) the alleged money laundering occurred outside Alabama, (2) a majority of the alleged victims were located outside Alabama, and (3) venue was improper as to Okorie, specifically, because all of the conduct linking the alleged conspiracy to Alabama occurred prior to Okorie joining the conspiracy.[13]

---

[13] The government argues that we should review this claim only for plain error because Okorie failed to renew his venue challenge at trial when moving for a judgment of acquittal.  Okorie maintains that he is challenging only the denial of his motion to dismiss the indictment for improper venue.  Therefore, we limit our discussion to that motion.

24-14115              Opinion of the Court                    19

We review *de novo* the "district court's denial of a motion to dismiss for improper venue." *United States v. Muench*, 153 F.3d 1298, 1300 (11th Cir. 1998). A criminal defendant has a constitutional right "to be tried in the district in which the crime was committed." *United States v. Snipes*, 611 F.3d 855, 866 (11th Cir. 2010) (quotations omitted). "[V]enue is an essential element of the government's proof at trial." *Id.* at 865 (quotations omitted). Thus, when an indictment is facially sufficient, whether venue was proper is a question of fact that must be left to the jury to decide. *Id.* at 866.

"In a conspiracy case, venue is proper in any district where an . . . act was committed in furtherance of the conspiracy. The government must support its choice of venue only by a preponderance of the evidence." *United States v. Smith*, 918 F.2d

---

Additionally, Okorie acknowledges that his argument that venue was improper as to him individually because the conduct linking the alleged conspiracy to the Northern District of Alabama occurred prior to his entering the conspiracy is foreclosed by our decision in *United States v. Davis*, 666 F.2d 195, 200 (5th Cir. Unit B 1982) (holding that "prior actions of coconspirators in furtherance of the conspiracy are attributable to one who later joins the conspiracy"). *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (acknowledging that decisions made by Unit B of the Fifth Circuit are binding precedent). Nevertheless, he urges us to apply a different standard. However, under the prior-panel-precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008). Accordingly, we are bound by *Davis*, and we do not discuss Okorie's argument on this point further.

1551, 1557 (11th Cir. 1990) (quotations and citations omitted); *see also* 18 U.S.C. § 1956(i)(2) (providing that a prosecution for conspiracy to commit money laundering "may be brought in the district where venue would lie for the completed offense . . . , or in any other district where an act in furtherance of the attempt or conspiracy took place").[14]

Here, the district court did not err in denying Okorie's motion to dismiss the indictment based on improper venue. Okorie was charged with conspiracy to commit money laundering; thus, the prosecution could be brought in the district where venue would exist for the completed offense had it been accomplished or in any district "where an act in furtherance of the attempt or conspiracy took place." 18 U.S.C. § 1956(i)(2); *Smith*, 918 F.2d at 1557. The superseding indictment alleged that acts in furtherance of the conspiracy took place in the Northern District of Alabama. Accordingly, the indictment contained facially sufficient allegations of venue, and the district court properly denied the motion to dismiss because, where there is a facially valid indictment, whether

---

[14] Okorie relies on *United States v. Cabrales*, 524 U.S. 1 (1998), for the principle that venue is proper only in the district where the money laundering occurred. His reliance is misplaced. *Cabrales* involved the substantive offense of money laundering, not conspiracy. *Id*. at 7–8. In holding that venue was appropriate only where the money laundering occurred, the Supreme Court expressly recognized that in conspiracy cases venue may lie based on the acts of a co-conspirator in a particular district. *Id*. Accordingly, *Cabrales* does not aid Okorie.

venue was proper is a question of fact that must be left to the jury to decide.[15]  *Snipes*, 611 F.3d at 866.

### B.  Material Variance Claim

For the first time on appeal, Okorie argues that there was a material variance between the allegations in the indictment and the evidence presented at trial.  Specifically, he contends that the indictment alleged a single conspiracy, but the evidence at trial established three different fraudulent schemes and reflected the kind of "rimless wheel" conspiracy and material variance described in *Kotteakos v. United States*, 328 U.S. 750, 755–57 (1946), and *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004).

Ordinarily, we review *de novo* whether a material variance occurred between the indictment's allegations and the evidence presented at trial.  *United States v. Goldstein*, 989 F.3d 1178, 1198 (11th Cir. 2021).  However, when a defendant failed to raise a material variance argument at trial, our review is for plain error.

---

[15] Although Okorie states in his reply brief that he is challenging only the denial of his motion to dismiss the indictment based on improper venue, we note that the jury did not err in concluding that venue was proper in the Northern District of Alabama because the government established by a preponderance of the evidence that acts in furtherance of the conspiracy occurred in the Northern District of Alabama.  Specifically, CCBCU employees in Birmingham received fraudulent e-mails requesting a change in payment procedures for CCSMI, and CCBCU complied with those instructions and sent money to accounts associated with the conspiracy.  Additionally, Jones, one of the romance scam victims, lived in Birmingham when she was contacted by someone pretending to be Vin Diesel who convinced her to send money to various accounts.

22                  Opinion of the Court                24-14115

*United States v. Wilson*, 788 F.3d 1298, 1312 (11th Cir. 2015).  Thus, to obtain relief, Okorie

> must show that there is: (1) error, (2) that is plain, and (3) that affects substantial rights.  If all conditions are met, [we] may then exercise [our] discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Id.* (quotations omitted).

"A variance exists where the evidence at trial proves facts different from those alleged in the indictment."  *Id.* (emphasis omitted) (quotations omitted).  Thus, a material variance can occur "if the government proves multiple conspiracies under an indictment alleging only a single conspiracy."  *United States v. Castro*, 89 F.3d 1443, 1450 (11th Cir. 1996).  Nevertheless, "a variance requires reversal only when the defendant can establish that his rights were substantially prejudiced."  *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015).

Importantly, "[t]he arguable existence of multiple conspiracies . . . does not constitute a material variance from the indictment if, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found that a single conspiracy existed beyond a reasonable doubt."  *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007) (quotations omitted).  In other words, "[a] material variance will only result if there is no evidentiary foundation for the jury's finding of a single conspiracy."  *United States v. Richardson*, 532 F.3d 1279, 1284 (11th

Cir. 2008); *Edouard*, 485 F.3d at 1347 ("[T]he jury makes the initial determination of whether the evidence supports a single conspiracy and their determination will not be disturbed if supported by substantial evidence." (quotations omitted)).

"To determine whether a jury could have found that [the] evidence established a single conspiracy beyond a reasonable doubt, we must consider: (1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *Richardson*, 532 F.3d at 1284 (quotations omitted). "[S]eparate transactions . . . are not necessarily separate conspiracies, so long as the conspirators act in concert to further a common goal." *Id.* (emphasis omitted) (quotations omitted). "Courts typically define the common goal element as broadly as possible. And as [we have] repeatedly stated, 'common' for the purposes of this test means 'similar' or 'substantially the same' rather than 'shared' or 'coordinate.'" *Id.* at 1285 (quotations and citation omitted).

> [Further, i]f a defendant's actions facilitated the endeavors of other co-conspirators or facilitated the venture as a whole, then a single conspiracy is established. It is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the government must prove is an agreement or common purpose to violate the law and intentional joining in this goal by coconspirators.

*Id.* at 1284 (emphasis omitted) (quotations and citations omitted). "Each co-conspirator thus does not have to be involved in every part of the conspiracy." *United States v. Seher*, 562 F.3d 1344, 1366 (11th Cir. 2009).

Here, viewing the evidence in the light most favorable to the government, Okorie cannot show that there was a material variance because there was sufficient evidence at trial to support the jury's conclusion that a single conspiracy existed. *See Richardson*, 532 F.3d at 1284–85. First, the evidence at trial demonstrated that the conspirators of the business e-mail compromise schemes and the romance schemes shared a common goal—to launder the proceeds from those online fraud schemes. Second, each co-conspirator's actions, even if they did not know each other, facilitated the achievement of this goal. For instance, the evidence at trial established that Omorusi created the fake Vin Diesel e-mail account. That account was used to correspond with some of the romance scam victims and convince the victims to receive and transfer money on behalf of the conspiracy. Some of that money was wired to bank accounts controlled by Okorie. Likewise, some of the money from the business e-mail compromise schemes was wired into bank accounts controlled by Okorie. And after every influx of cash, Okorie quickly withdrew, transferred, or otherwise used the funds. Third, the evidence demonstrated a link between Okorie and co-conspirator Ebhodaghe because, after receiving proceeds from the online schemes, Okorie frequently sent substantial funds to Ebhodaghe's business, Ebhos Auto. Ebhos Auto, in turn, also wired substantial

24-14115              Opinion of the Court                    25

funds to co-conspirator Asikhia's bank in Nigeria. Accordingly, viewing the evidence in the light most favorable to the government, the jury could have found beyond a reasonable doubt that a single conspiracy existed.

We also disagree with Okorie that the evidence in this case depicted a "rimless wheel" conspiracy. Specifically, in "a classic 'hub-and-spoke' conspiracy . . . a central core of conspirators [('the hub')] recruits separate groups of co-conspirators to carry out the various functions of the illegal enterprise [('the spokes')]." *Chandler*, 388 F.3d at 807. "The core conspirators [in the hub] move from spoke to spoke, directing the functions of the conspiracy." *Id.* "A 'rimless wheel' conspiracy is a variation of the 'hub-and-spoke' model, in which the individual at the 'hub' of the conspiracy interacts separately with those along the various 'spokes' of the wheel." *Seher*, 562 F.3d at 1367; *see also Kotteakos*, 328 U.S. at 755, 768–69. Thus, in a "rimless wheel" conspiracy, "the 'spokes' of a conspiracy have no knowledge of or connection with the other 'spokes' and deal independently with the hub conspirator." *Seher*, 562 F.3d at 1367 (alteration adopted) (quotations omitted). As a result, "there is not a single conspiracy, but rather as many conspiracies as there are spokes. . . . because there is no rim to connect the spokes in a single scheme." *Id.* (quotations and citation omitted). Here, as discussed above, there was substantial evidence that the co-conspirators were aware of the nature and scope of the schemes and were aware of each other, as evidenced by the large sum money transfers between Okorie and Ebhos Auto and Ebhos

Auto and Asikhia. Accordingly, the conspiracy here was not a "rimless wheel." *See id.*

### C. Rule 404(b) Evidence Claim

Okorie argues that the district court erred in admitting evidence of his prior convictions under Rule 404(b).[16] He maintains that the evidence was more prejudicial than probative and was unnecessary because there was sufficient other evidence demonstrating his knowledge and intent.

"We review a district court's evidentiary rulings for abuse of discretion." *United States v. Troya*, 733 F.3d 1125, 1131 (11th Cir. 2013). "[T]he district court is uniquely situated to make nuanced judgments on questions that require the careful balancing of fact-specific concepts like probativeness and prejudice, and we are loathe to disturb the sound exercise of its discretion in these areas." *Id.* (quotations omitted).

Evidence of other crimes, wrongs, or bad acts is not admissible to prove a person's character in order to show that he acted in conformity with that character. Fed. R. Evid. 404(b)(1).

---

[16] For the first time in his reply brief, Okorie also argues that the district court erred in admitting under Rule 404(b) his grand jury testimony from his prior case. It is well-established that we will not "consider issues raised for the first time in an appellant's reply brief." *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004) (collecting cases); *see also United States v. Fiallo-Jacome*, 874 F.2d 1479, 1481 (11th Cir. 1989) ("An appellant in a criminal case may not raise an issue for the first time in a reply appellate brief . . . ."). Accordingly, we do not address Okorie's Rule 404(b) argument concerning the admission of his grand jury testimony.

However, evidence of other crimes "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. R. 404(b)(2). Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id*. R. 403. "Exclusion under Rule 403 is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." *Troya*, 733 F.3d at 1132 (quotations omitted); *see also United States v. Kapordelis*, 569 F.3d 1291, 1313 (11th Cir. 2009) ("Rule 404(b) is a rule of inclusion, and accordingly 404(b) evidence, like other relevant evidence, should not be lightly excluded when it is central to the prosecution's case." (quotations omitted)). Furthermore, a limiting instruction to the jury can diminish any unfair prejudice caused by the admission of Rule 404(b) evidence. *Edouard*, 485 F.3d at 1346.

Importantly, "[a] defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue." *Id*. at 1345 (quotations omitted). A similarity between an extrinsic act and the "charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense." *United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005).

Here, the district court did not abuse its discretion in admitting the evidence of Okorie's prior 2011 convictions. By pleading not guilty and going to trial, Okorie made his intent a contested issue, and his prior 2011 convictions for wire fraud and money laundering were probative of his intent in this case, which involved a conspiracy to commit money laundering. *See Edouard*, 485 F.3d at 1345; *Ramirez*, 426 F.3d at 1354. Although Okorie is correct that the government had other evidence against him including his numerous bank accounts, multiple money transfers, and his experience as a certified fraud examiner, none of that evidence necessarily demonstrated his intent. And he argued throughout the trial that he lacked the necessary intent and knowledge. Thus, evidence of his prior 2011 convictions was a key part of the government's ability to establish his intent in this case. *See Edouard*, 485 F.3d at 1345.

Moreover, even if Okorie could show that the risk of prejudice from this evidence outweighed the probative value, "any unfair prejudice possibly caused by admitting evidence of [Okorie's prior convictions] was mitigated by the district court's limiting instruction to the jury." *Id.* at 1346. Accordingly, the district court did not abuse its discretion in admitting the prior convictions under Rule 404(b).

### D. *Jury Instruction Claim*

Okorie argues that the district court erred in giving a deliberate ignorance instruction because such an instruction is not

proper when, as here, the government presented evidence of actual knowledge.

"We . . . review de novo whether the circumstances of a particular case rendered it appropriate to instruct the jury on deliberate ignorance." *United States v. Morley*, 99 F.4th 1328, 1336 (11th Cir. 2024). "[W]e will reverse only if we are left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." *Id.* (quotations omitted).

In order to convict Okorie of conspiracy to commit money laundering, the government had to prove that Okorie knew that the proceeds involved were derived from an illegal activity. *See United States v. Martinelli*, 454 F.3d 1300, 1310 (11th Cir. 2006); *United States v. Medina*, 485 F.3d 1291, 1300 (11th Cir. 2007). "[D]eliberate ignorance of criminal activity [is] the equivalent of knowledge." *United States v. Arias*, 984 F.2d 1139, 1143 (11th Cir. 1993) (quotations omitted).

> A deliberate ignorance instruction is appropriate when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution. We have cautioned the district courts against instructing juries on deliberate ignorance when the evidence only points to either actual knowledge or no knowledge on the part of the defendant. But it is not error when the evidence

could support both actual knowledge or deliberate ignorance and the jury was instructed on both.

*Morley*, 99 F.4th at 1342 (quotations and citations omitted).

Here, the district court did not err in giving the deliberate ignorance instruction because the evidence could support both actual knowledge or deliberate ignorance. *Id.* Okorie's defense at trial was that there was no evidence that he knew that the funds wired into his account were the result of criminal activity. The evidence showed that Okorie, who was a certified fraud examiner, received several wire transfers of substantial funds into various accounts and then quickly moved those funds out of those accounts. The jury could have inferred that the amounts of cash being transferred strongly suggested criminal activity and that Okorie deliberately avoided learning more in order to protect himself in the event of a future prosecution. Accordingly, the deliberate ignorance instruction was proper. *See United States v. Puche*, 350 F.3d 1137, 1149 (11th Cir. 2003) (upholding the deliberate ignorance instruction under similar circumstances).

### E.  Sentencing Claims

Okorie argues that his sentence is procedurally unreasonable because the district court used his prior sentence as the starting point for its sentencing determination instead of the guidelines range.[17]  He maintains that the district court relied so

---

[17] We note that Okorie failed to make this argument in the district court and only objected generally to the reasonableness of the end of the sentencing

24-14115                Opinion of the Court                31

heavily on his prior sentence in fashioning the current sentence that it essentially improperly created a floor for the current sentence based on his prior sentence and failed to conduct its own analysis of the relevant 18 U.S.C. § 3553(a) factors. Additionally, he argues that his sentence is substantively unreasonable because it is greater than necessary to accomplish the objectives of § 3553(a) and is an unwarranted sentencing disparity.[18]

We review a sentence for procedural and substantive reasonableness under an abuse of discretion standard. *See Gall v.*

---

hearing. Accordingly, it does not appear that he preserved this argument and that we should review it for plain error. *See United States v. Hamilton*, 168 F.4th 1354, 1367 (11th Cir. 2026) (explaining that we review an unpreserved claim of procedural unreasonableness only for plain error). However, because the government does not make that argument and asserts that the abuse of discretion standard applies, we will review Okorie's procedural reasonableness challenge for abuse of discretion.

[18] Okorie also argues for the first time on appeal that the district court violated his Fifth and Sixth Amendment rights by imposing the guidelines enhancements based on judicial fact-finding, citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Alleyne v. United States*, 570 U.S. 99 (2013), and their progeny. Okorie cannot show plain error because this claim is squarely foreclosed by binding precedent. *See United States v. Charles*, 757 F.3d 1222, 1225 (11th Cir. 2014) (rejecting identical challenge and holding that "a district court may continue to make guidelines calculations based upon judicial fact findings and may enhance a sentence—so long as its findings do not increase the statutory maximum or minimum authorized by facts determined in a guilty plea or jury verdict"); *see also United States v. Dean*, 487 F.3d 840, 854 (11th Cir. 2007) (explaining that a district court may enhance a sentence based on its judicial fact findings, so long as it treats the guidelines as advisory and its findings do not increase the sentence beyond the statutory maximum authorized by the offense). Accordingly, we do not address it further.

*United States*, 552 U.S. 38, 51 (2007).  In reviewing a sentence for procedural reasonableness, we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the [g]uidelines range, treating the [g]uidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *United States v. Pugh*, 515 F.3d 1179, 1190 (11th Cir. 2008) (quoting *Gall*, 552 U.S. at 51).

As for substantive reasonableness, the district court must issue a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of § 3553(a)(2), which include the need for a sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, and protect the public from future criminal conduct.  18 U.S.C. § 3553(a).  The court must also consider the "nature and circumstances of the offense and the history and characteristics of the defendant," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *Id.* § 3553(a)(1), (6).  When evaluating the § 3553(a) factors, a court may properly consider information that is already accounted for in the guidelines.  *See United States v. Williams*, 526 F.3d 1312, 1324 (11th Cir. 2008) (explaining that the district court could properly consider the defendant's criminal history as part of the § 3553(a) factors even though it was already "part of the calculation of his guideline range"); *see also United States v. Dougherty*, 754 F.3d 1353,

1362 (11th Cir. 2014) ("The district court may consider facts that were taken into account when formulating the guideline range for the sake of a variance.").

"[T]he district court need only acknowledge that it considered the § 3553(a) factors, and need *not* discuss each of these factors . . . ." *United States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007) (emphasis in original) (quotation and citation omitted). Importantly, the weight given to a particular § 3553(a) factor "is committed to the sound discretion of the district court," and it is not required to give "equal weight" to the § 3553(a) factors. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (quotation omitted). "We will not second guess the weight given to a § 3553(a) factor so long as the sentence is reasonable under the circumstances." *United States v. Butler*, 39 F.4th 1349, 1355 (11th Cir. 2022). A district court abuses its discretion when it (1) fails to consider relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment by balancing the proper factors unreasonably. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*).

"Upward variances are imposed based upon the § 3553(a) factors." *Butler*, 39 F.4th at 1355. No presumption of reasonableness or unreasonableness applies to a sentence that lies outside the advisory guidelines range. *Id.* Extraordinary justification or "rigid mathematical formula[s]" are not required for a sentence outside the guidelines range, but the district court

should explain why the variance is appropriate and the "justification for the variance must be sufficiently compelling to support the degree of the variance." *Irey*, 612 F.3d at 1186–87 (quotations omitted).

The burden rests on the party challenging the sentence to show "that the sentence is unreasonable in light of the entire record, the § 3553(a) factors, and the substantial deference afforded sentencing courts." *Rosales-Bruno*, 789 F.3d at 1256. We will "vacate the sentence if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (quotations omitted).

Here, Okorie's sentence is procedurally reasonable because, contrary to his contention, the district court did not treat his prior sentence as a baseline for his current sentence. Rather, the record confirms that the district court started with the guidelines range and then varied upward based on the relevant § 3553(a) factors, including Okorie's bad conduct in the present offense, his personal history and characteristics (which included his prior convictions and sentence), and the need for deterrence. Although the district court clearly considered Okorie's prior sentence when making its decision, such a consideration was not erroneous. First, it is well-established that the district court was entitled to consider Okorie's prior criminal history even if it was already accounted for by the guidelines. *See Williams*, 526 F.3d at 1324. Second, "[c]ourts

have broad leeway in deciding how much weight to give to prior crimes the defendant has committed, and placing substantial weight on a defendant's criminal record is entirely consistent with § 3553(a) because five of the factors it requires a court to consider are related to criminal history." *United States v. Riley*, 995 F.3d 1272, 1279 (11th Cir. 2021) (alteration adopted) (quotations and citation omitted); *see also Butler*, 39 F.4th at 1355 (explaining that "a court may also impose an upward variance if it concludes that the [g]uidelines range was insufficient in light of a defendant's criminal history"). Accordingly, the sentence is procedurally reasonable.

Turning to the substantive reasonableness of the sentence, the district court did not abuse its discretion in varying upward from the applicable guidelines range of 70 to 87 months' imprisonment and imposing a sentence of 108 months. The district court explained that an upward variance was appropriate because of the nature and circumstances of the offense, Okorie's criminal history and personal characteristics, and the need to provide adequate deterrence. The district court acted within its discretion in giving more weight to certain sentencing factors over others and provided sufficient justifications for the variance. *See Rosales-Bruno*, 789 F.3d at 1254. At bottom, Okorie quarrels with how the district court weighed the relevant § 3553(a) factors, but "[w]e will not second guess the weight" the district court gave the § 3553(a) factors. *Butler*, 39 F.4th at 1355.

To the extent Okorie argues that his sentence created an unwarranted sentencing disparity because Ebhodaghe and Asikhia

received lower sentences, it is not enough for Okorie "to simply compare" his sentence to that of a co-conspirator.[19] *United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015) ("One needs to have more than the crime of conviction and the total length of the sentences to evaluate alleged disparities."). Rather, "[t]he underlying facts of the crime and all of the individual characteristics are relevant," and Okorie has not carried his burden to produce specific facts concerning Ebhodaghe's and Asikhia's individual characteristics.[20] *Id.*; *see also United States v. Johnson*, 980 F.3d 1364, 1386 (11th Cir. 2020) (rejecting disparity claim because "[d]efendant ha[d] not carried his burden to show specific facts establishing that any codefendants [were] similarly situated").

Finally, we note that Okorie's 108-month sentence is below the statutory maximum of 10 years' imprisonment, which is another indicator of reasonableness. *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (explaining that a sentence that is below the statutory maximum is an indicator of reasonableness). Accordingly, we are not "left with the definite and firm conviction that the district court committed a clear error of judgment in

---

[19] We also note that "disparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal." *United States v. Cavallo*, 790 F.3d 1202, 1237 (11th Cir. 2015) (alteration adopted).

[20] Moreover, we note that based on the government's statements at sentencing, Okorie is not similarly situated to Ebhodaghe or Asikhia because (1) they cooperated with the government and made multiple proffers and (2) they did not have criminal history. These facts explain why they received lower sentences than Okorie.

weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (quotations omitted). Consequently, we conclude that Okorie's sentence is procedurally and substantively reasonable.

## F.  Restitution Claim

For the first time on appeal, Okorie argues that the district court erred in ordering the immediate payment of $30,713 in restitution without considering his financial condition and ability to pay.

Generally, we review the legality of a restitution order *de novo*. *United States v. Edwards*, 728 F.3d 1286, 1291 (11th Cir. 2013). However, because Okorie failed to raise this objection below, "we review only for plain error." *United States v. Romines*, 204 F.3d 1067, 1068 (11th Cir. 2000).

After the district court establishes the amount of restitution owed, it should "consider[] the defendant's financial resources to create a schedule for restitution payments." *Edwards*, 728 F.3d at 1291.  Nevertheless, "the defendant bears the burden of demonstrating his financial condition, and the court can rely on the [PSI] and need not make independent findings." *Id.*

Here, Okorie's PSI contained a detailed accounting of his assets and liabilities and indicated that he had a net worth of $115,918.  He did not object to this data.  Nor did he offer any other evidence of his financial status and ability to make the restitution.

Accordingly, the district court did not err, plainly or otherwise, in relying on the information in the PSI.  *See id.*

### III.    Conclusion

For the above reasons, we affirm Okorie's conviction and sentence.

**AFFIRMED.**